**Carl Eugene MOODY and Kenneth Charles Moody, Appellants,**

v.

**The STATE of Texas, Appellee.**

**Nos. 01–89–00378–CR, 01–89–00379–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

April 30, 1992.

Rehearing Denied June 25, 1992.

Peter W. Lewis, Houston, for appellants.

John B. Holmes, Jr., Dist. Atty., Calvin Hartman, Asst. Atty., Houston, for appellee.

Before OLIVER–PARROT, C.J., and O'CONNOR and COHEN, JJ.

## OPINION

O'CONNOR, Justice.

A jury found brothers Carl Eugene Moody and Kenneth Charles Moody guilty of resisting arrest. The trial court sentenced Carl to 20 days in jail and a $150 fine, and sentenced Kenneth to 90 days in jail and a $200 fine. Another brother, Davis Moody, was also charged, but the trial court instructed an acquittal as to him. We reverse and remand the judgment for retrial.

### 1. Sufficiency of the evidence

In point of error three, appellants complain the evidence is insufficient to support their convictions where the officers used excessive force.

The proper standard of review when weighing the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Butler v. State,* 769 S.W.2d 234, 239 (Tex.Crim.App.1989).

In this case, where the testimony of the State's witnesses conflicts with the defense testimony, and where the State's

eyewitness directly contradicts the testimony of the complaining witness, we note that the trier of fact may believe all, part, or none of any witness' testimony. *Sharp v. State,* 707 S.W.2d 611, 614 (Tex.Crim.App. 1986). The jury is to resolve questions about the credibility of witnesses and the weight to be given their testimony. *Bonham v. State,* 680 S.W.2d 815, 819 (Tex. Crim.App.1984). The jury is also to resolve conflicts in the evidence, and such conflicts will not call for reversal if there is enough credible testimony to support the conviction. *Bowden v. State,* 628 S.W.2d 782, 784 (Tex.Crim.App.1982). If there is evidence which establishes guilt beyond a reasonable doubt, and if the trier of fact believes that evidence, the judgment cannot be reversed on sufficiency of the evidence grounds. *Wicker v. State,* 667 S.W.2d 137, 143 (Tex.Crim.App.1984).

The information charged that appellants did "intentionally obstruct and prevent the arrest and search of the defendant by G. Scott, hereafter styled the Complainant, by use of force against the Complainant [Officer Scott], namely by *pushing the Complainant with his hand,* knowing the Complainant was a peace officer." *See* Tex. Penal Code Ann. § 38.03(a) (Vernon 1974) (emphasis added).

The Texas Penal Code provides that

(b) The use of force against another is not justified:

(2) to resist an arrest or search that the actor knows is being made by a police officer, or by a person acting in a peace officer's presence and at his direction, even though the arrest or search is unlawful, unless the resistance is justified under Subsection (c) of this section;

(c) The use of force to resist an arrest or search is justified:

(1) if, before the actor offers any resistance, the peace officer ... uses or attempts to use greater force than necessary to make the arrest or search; and

(2) when and to the degree the actor reasonably believes the force is immediately necessary to protect himself against the peace officer's ... use or attempted use of greater force than necessary.

Tex.Penal Code Ann. § 9.31(b)(2), (c)(1) and (2) (Vernon 1974).

### a. *Arrest of Carl Moody*
#### (1) Officer Scott's testimony

Houston police officer Garland Scott, the complainant, provided the bulk of the State's evidence against appellants. He testified that at around 10:00 p.m. on August 12, 1988, he was on routine patrol, when he noticed a young, black male standing outside a convenience store consuming alcohol. With two other officers in a patrol car close behind, Scott approached the man with the intent to inform him he was committing a class C misdemeanor,[1] and to ask him to leave the premises. At trial, Scott identified this man as Carl Moody. Scott said Carl just looked at Scott as if he was not even there and tried to walk away from him. Because Carl would not leave the premises and would not get rid of the alcoholic beverage, Scott decided to arrest him. Scott testified Carl resisted arrest by striking Scott in the chest and shoulders three or four times with his fist. Scott punched back to defend himself. Officer O'Neal, one of the officers in the other patrol car, assisted Scott in Carl's arrest. Officer O'Neal said he did not see Carl holding a beer.

Scott testified that, while Scott and O'Neal were attempting to arrest Carl, Davis ran up from behind and pushed him away, stating Scott could not arrest his brother. Both Carl and Davis were eventually subdued, handcuffed, and placed in the back of O'Neal's patrol car.

#### (2) Officer Williams' testimony

Officer David Williams testified he saw Carl reaching for a matchbox inside the truck. He asked Carl to open the box. Carl complied and showed Williams the box contained only matches. Williams said he

---

**1.** Texas law provides that "[n]o person may break or open a container containing liquor or beer or possess an opened container of liquor or beer on the premises of a package store." Tex. Alco.Bev.Code Ann. § 22.10 (Vernon 1978).

asked for the box because he assumed it contained narcotics; people in the area commonly carry their drugs in matchboxes.

Officer Williams corroborated some, but not all, of Officer Scott's testimony. Williams stated that during Scott's attempt to place Carl under arrest, he saw Carl push Scott. Even after Carl was eventually handcuffed, he said Carl continued to resist. Williams had his nightstick and his flashlight, but he denied striking any blows to any of the defendants' heads.

Officer Williams contradicted Officer Scott's statement that Carl was attempting to walk away from the scene. Williams said Scott and Carl were having a conversation. Williams also contradicted Scott's statement that Carl was drinking a beer. Williams was right behind Scott in another patrol car. They pulled up to the store at the same time. Williams said he did not see Carl drinking a beer, nor did he see Carl with a beer in his hand.

Officer Williams also contradicted his own testimony. On cross-examination, Williams retracted his earlier statement that when Scott had told him, "I'm having trouble with the Moody brothers," he did not know who the men were. On cross-examination he admitted he had met the brothers before. Later in his testimony, Williams stated the officers had discussed the case many times because "we meet these guys all the time on the street." Williams said, in response to a question, that he knew them well.

### b. *Arrest of Kenneth Moody*

While Scott and Williams were in the process of arresting Carl and Davis, Kenneth, who was inside the store, called home for his father, a former deputy with the sheriff's department. After calling his father, Kenneth, who was upset, went outside and then returned to the store to again call home to see if his father was on the way.

#### (1) Officer Scott's Testimony

Officer Scott testified that Kenneth went in and out of the store a couple of times. Scott said that Kenneth came off the porch and pushed one of the officers who were trying to arrest his brothers. Kenneth, however, was not charged with pushing any officer except Scott. On cross-examination, when asked when Kenneth pushed him, Scott specifically stated Kenneth did not push him (and thus resist arrest) until they were inside the store, after he and another officer fell on top of Kenneth. Before arresting Kenneth, and because of Kenneth's large size, Scott radioed for additional backup. When Officer Myrick arrived, all four officers tried to arrest Kenneth. As the four officers approached Kenneth, he backed into the store, telling them he was not under arrest, and, as Officer Scott testified, that it would take additional officers to arrest him.

In describing the scene inside the store, Scott said Kenneth was very upset and irrational, yelling and screaming that he was not going to go to jail. In the process, the officers and Kenneth continued to fight, "knocking down all kinds of items on the floor, just totally tearing up the store." Scott estimated that approximately 15 to 25 bottles of beer fell off a display and shattered on the floor. During the scuffle in the store, Kenneth fell onto the floor. Scott explained: "The next I knowed [sic], blood was everywhere. Apparently, he must have cut his head on one of the broken bottles, and he looked up at us and he told us he give [sic] up and just stated, 'I give.'" At that point the officers handcuffed Kenneth and placed him in Scott's patrol car.

Officer Scott denied taking the appellants to the hospital to have their wounds attended. Scott said they were seen by a fire department ambulance that came to the scene. Scott did not know if Kenneth needed stitches in his head, stating, "I am not a doctor." He took Kenneth "directly to the Houston Police Department Jail and I know for a fact he did not go to the hospital." When asked about the injuries Carl received, Scott stated: "I know for a fact he wasn't treated."

#### (2) Officer Williams' testimony

Officer David Williams testified that while they were arresting Carl, Kenneth

kept coming over and yelling, "You are not going to take him." Williams relates what happened next:

> At that time [the officers were arresting Carl], Davis, he came up while I was trying to keep Kenneth off the other two officers because he is a big man. He came up and started pulling on Officer Scott and Officer O'Neal, pushing them, pulling them, trying to pull Carl out from them and keep him from going into the patrol car.

As to the use of force, Officer Williams testified that, after Officer Myrick arrived and Carl and Davis were handcuffed and placed in the police car, all four officers attempted to arrest Kenneth. The following transpired:

> I reached out to grab [Kenneth]. When I did, he just pulled me and the other three officers ... pulled all four of us inside. He backed all the way through into the convenience store. And right directly in front of the cash register was a display of—beer display, a large beer display with glass containers and two large candy displays, if I remember correctly. And we hit those and everybody just piled up with Kenneth on the bottom.
>
> Prosecutor: Y'all fell on the ground?
>
> A: That's correct. Water and ice and broken glass just went everywhere.
>
> Q: And what happened next?
>
> A: At that time, we tried to handcuff the man's arms behind his back. He kept resisting. He is real strong and he just wouldn't do it. We tried to use pressure points on him. We tried to strike nerves in his legs, which we are trained do in our tactics at the Academy and regular in-service training. It just wouldn't seem to work. The man has got big legs, a lot of meat on his bones, just couldn't do it. Eventually, he did surrender to us, saying he did give up, and he voluntarily let us handcuff him.
>
> Q: And was Kenneth Moody injured?
>
> A: He had a laceration on his head. It was approximately a half to three-quarters of an inch. That is the only one that I did see, and he was bleeding from it. I

also want to state, too, that the fourth officer, the night shift officer, he had a swollen hand and there was a knot coming up on it and we later found out that his hand was broken.

Williams denied striking any of the defendants on the head with his nightstick: "It's against HPD policy." On cross-examination, when asked, "Did your nightstick or flashlight ever make contact with any of these gentlemen?", Williams responded, "Sure did." Williams stated he did strike Kenneth on the hand with a nightstick when he grabbed Williams' gun and tried to pull the weapon out through the front of the holster. Kenneth was not charged with pushing Williams.

### (3) The State's eyewitness testimony

The State called Kim Nguyen, who owns the Dainty Food Market, the store where appellants were arrested. She testified she saw Kenneth outside the store with three policemen. The police told Kenneth, "You have to go with me, man." Kenneth replied, "I don't go nowhere." Kim said the police struck Kenneth on the head after Kenneth opened the door and three of the officers followed Kenneth into the store. She said the officers grabbed Kenneth's arm, and as they fell on him and the display unit, the officers struck Kenneth. Kim said she saw everything and never saw Kenneth push Officer Scott in the chest. Kim did not see anything that occurred outside the store. Kim contradicted Officer Williams' testimony by stating the officers did hit Kenneth on the head. Both officers guessed that Kenneth's head wound was the result of a cut by a broken bottle, and both denied that they had hit him on the head.

### (4) Records custodian's testimony

The appellants called Gladys Marie Charles, the custodian of records at Ben Taub Hospital, to testify. She brought medical records on both Kenneth and Carl that showed each was treated at Ben Taub

on the night in question.[2] Kenneth was treated for "blunt trauma to the head this evening. No loss of consciousness. Patient in police custody. Laceration times two to the forehead, each approximately two centimeters long." Carl complained of being hit in the head and left leg with a flashlight.

### (5) Appellants' testimony

Both appellants and Davis testified. Their version of the facts conflicts considerably with that of Scott and Williams. The three brothers testified that Kenneth was inside the store playing a video game when Officer Scott first drove up to the store. Carl, who had driven Davis' truck to the store, was standing in front of the store with another man, Derrick Porter. It was Porter who was drinking a beer, not Carl. All three brothers testified that neither Carl nor Kenneth drink any alcohol. Officer Scott pulled up, followed by Williams. Scott took the beer from Porter and put it in the front seat of Kenneth's truck. Williams asked Carl for a match, and Carl complied. Williams then asked Carl for the entire matchbox and after Carl gave it to him, Williams struck Carl on the side of his head with a flashlight. Williams then grabbed Carl, twisted his arm behind his back and threatened to break it. Carl was then handcuffed and placed in the patrol car. Carl denied pushing, kicking, or shoving either Scott or Williams.

Davis said he was across the street from the store when he saw that three officers had Carl on top of Davis' car beating him with their flashlights. The police officers were trying to put handcuffs on Carl. Davis came over to help Carl and he was arrested also. Davis did not see any of the events that took place inside the store. He saw the police bring Kenneth out, handcuffed and bleeding from the head. Kenneth told Davis he had been hit in the head with a flashlight.

Kenneth's testimony about the events outside the store was similar to that of Davis and Carl. Kenneth denied ever

pushing Scott. Kenneth also denied pulling three of the officers into the store with him. He stated:

> I walked on back into the store. At the time I walked on back in the store, I was looking out the door and the next thing I know, about nine officers came in the store with flashlights. I just backed up. The next thing I know, a flashlight hit me up side my head.

### (6) The prosecutor's statement

The prosecutor, in response to the motion for directed verdict, admitted there was no evidence Kenneth resisted arrest outside the store, and the only evidence Kenneth pushed Officer Scott was when Kenneth was at the bottom of the heap of officers:

> I agree with defense counsel's rendition of the facts up to the point, and he says Kenneth Moody was pulling back and Officer Scott continues to testify that it was at that time one of the officers broke his hand when he struck Kenneth, that they go to the floor all together and then a fracas ensues at that time. It's at that time that our complainant [Officer Scott] indicated to the Court and to the jury that he was pushed, which is in accordance with the pleadings that the State has set out.

### c. *Resolution of point three*

■ We conclude that Scott's and Williams' testimony concerning the difficulties they and the other officers encountered while attempting to place Carl under arrest, and the injury sustained by Officer Myrick during this incident, are sufficient to sustain Carl's conviction for resisting arrest.

■ We conclude that Scott's and Williams' testimony concerning the difficulties they had with the arrest of Kenneth inside the store are sufficient to sustain Kenneth's conviction for resisting arrest.

We overrule point of error three.

---

**2.** Charles testified that Houston Police Department officers brought Kenneth and Carl to the hospital, but she could not say who the officers were.

## 2. Factual sufficiency of the evidence

■ In point of error four, appellants assert the jury's verdict is against the great weight and preponderance of the evidence because appellants denied committing the offense. Relying on *Meraz v. State*, 785 S.W.2d 146 (Tex.Crim.App.1990), appellants argue this Court must reverse their convictions and order a new trial. In *Meraz*, the Court of Criminal Appeals held that TEX. CONST. art. V, § 6 "confers conclusive jurisdiction on the courts of appeals to resolve questions of weight and preponderance of the evidence adequate to prove a matter *that the defendant must prove.*" *Id.* at 154 (emphasis added); *see also Patel v. State*, 787 S.W.2d 410, 411 (Tex.Crim. App.1990).

Appellants presented the defense of self-defense in response to the police officers' use of excessive force. *See* TEX.PENAL CODE ANN. § 9.31(a) (Vernon 1974). Citing TEX.PENAL CODE ANN. § 2.03(d) (Vernon 1974), appellants admit that once they raised the defense, *the State had the burden* to refute the affirmative defense beyond a reasonable doubt. Because self-defense is an issue upon which the State bears the burden of proof, the *Meraz* standard of review is not appropriate. The proper standard of review is that set out in *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789, and *Butler*, 769 S.W.2d at 239, as discussed above.

We overrule point of error four.

## 3. Restriction of cross-examination

In point error five, appellants claim that because the police officers' use of excessive force was an issue in the case, the trial court committed reversible error when it prevented appellants from cross-examining Officer Scott about his use of a nightstick. We agree.

### Error in excluding evidence

Officer Scott testified on direct examination that he never carried a nightstick. On cross-examination defense counsel asked Scott if carried a nightstick several days later when he had another run-in with Davis. Contemporaneous with the State's relevancy objection, Scott answered, "No." The trial court conducted a hearing outside the presence of the jury. The following testimony was elicited:

Q: You didn't have a nightstick?

A: No, sir.

Q: You didn't have a nightstick?

A: No, I can't recall that. I do not carry a nightstick.

Q: Did you have a partner with you, maybe you borrowed his?

A: My partner carried one occasionally.

Q: Did you borrow his?

A: *I probably had it;* I can't recall.

Q: You got out of the car with the nightstick, didn't you?

A: I can't recall one incident.

Q: You got out of the car with the nightstick and you approached Davis Moody and you had the nightstick like this in your hand and you were slapping it in your hand?

A: I can't recall.

Q: And you slapped it with your hand and you said, "Next time I tie up with you, you are not going to Ben Taub." Isn't that what you said?

A: I know for a fact I did not make that statement.

Q: And you said, "You are not going to Ben Taub, you are going to the morgue." Those were your exact words?

A: No.

Q: You didn't say that to Davis Moody?

A: No.

In a case factually similar to this case, the trial court excluded a police officer's testimony concerning the use of a stun gun. In *Posey v. State*, 738 S.W.2d 321 (Tex.App.—Dallas 1987, pet. ref'd), the defendant was charged with resisting arrest. *Id.* at 322. Like appellants' theory here, the main defense theory in *Posey* was that Posey resisted the excessive force applied by the arresting officers. *Id.* at 324. During cross-examination of Officer Whitlatch, the arresting officer, the defense counsel tried to question the officer about the consequences of using excessive force and the officer admitted he could lose his job for using excessive force. *Id.* at 323. In a

hearing outside the presence of the jury, Whitlatch said he was reprimanded when he used a "stun gun" on a person who was resisting arrest, not for using excessive force, but rather for possessing the stun gun. *Id.* at 324. The trial court ruled that because the matter related to the improper possession of equipment, and not the use of excessive force, the evidence did not relate to a material element of the offense. *Id.* The Dallas Court held the trial court erred in excluding the officer's testimony because the jury was entitled to judge for themselves any possible motivation for testifying and to judge a witness' credibility in light of any possible ill will or bias. *Id.*

Here, Officer Williams testified it was against HPD policy to strike someone on the head with a nightstick. Counsel attempted to question Scott about his use of a nightstick on this and later occasions. The trial court ruled the testimony was not relevant and refused to permit the jury to hear it.

■■■ We recognize that the determination of the admissibility of evidence is within the sound discretion of the trial court, *Jackson v. State*, 575 S.W.2d 567, 570 (Tex.Crim.App.1979), and such a decision will not be reversed on appeal unless a "clear abuse of discretion" is shown. *Werner v. State*, 711 S.W.2d 639, 643 (Tex. Crim.App.1986). The trial court, however, should permit a defendant great latitude when attempting to show a witness' bias or motivation to testify falsely. *Bates v. State*, 587 S.W.2d 121, 133 (Tex.Crim.App. 1979); *Jackson v. State*, 552 S.W.2d 798, 801 (Tex.Crim.App.1977). The jury should be. allowed the opportunity to judge the witness' credibility in light of the ill feeling, bias, motive, or animus shown by the evidence. *Wood v. State*, 486 S.W.2d 359, 362 (Tex.Crim.App.1972).[3]

■■■ The evidence appellants' elicited in an attempt to impeach Scott is admissible

because Scott, the complainant, gave the most damaging testimony about the appellants. *See Blake v. State*, 365 S.W.2d 795, 796 (Tex.Crim.App.1963). The police officer's credibility was all important; any possible malice, bias, or prejudice towards the appellants would be admissible to attack his credibility. *Blair v. State*, 511 S.W.2d 277, 279 (Tex.Crim.App.1974).

Because appellants' theory was that they were merely resisting the excessive force by Officers Scott and Williams, and because the issue of the officers' use of force was sharply contradicted by the witnesses at trial, the trial court should have permitted defense counsel to cross-examine Scott before the jury about his use of a nightstick while on duty.

### The harm

■■■ Having determined the trial court erred in limiting appellants' right to cross-examine Scott, we must now determine whether, beyond a reasonable doubt, the error made no contribution to appellants' convictions. TEX.R.APP.P. 81(b)(2).

In front of the jury, Scott said he never carried a nightstick; outside the presence of the jury, Scott first denied carrying one the day in question, then, vacillating, said, "I probably had it," and finally, "I can't recall." Davis testified that he saw Scott with a nightstick "all the time." Kenneth testified that approximately three weeks after the incident in question, he saw Scott carrying a nightstick.

Even though the appellants testified that Scott carried a nightstick, and thus presented by their testimony the same evidence that the trial court excluded from Officer Scott's testimony, we conclude appellants were harmed by the exclusion of Officer Scott's testimony. Because "[a]n unbelievable denial of the existence of a fact can be even more probative as to lack

---

**3.** The ill will or animus here is evidenced by the testimony of Davis and Kenneth, who stated that Scott had come into the market about 3:00 or 4:00 that afternoon to talk to Kenneth about a fight Carl and Davis had been in with a man who had attacked Carl with a machete. Kenneth would not give Scott any information

about the incident, and Kenneth testified Scott was angry about his lack of cooperation. Davis testified that when Scott could not locate him or Carl after the fight, he decided to get back at them.· Davis testified that is why he beat up Carl at the food market.

of credibility than an affirmative admission," *Spain v. State*, 585 S.W.2d 705, 710 (Tex.Crim.App.1979), the appellants' testimony stating Scott did have a nightstick was not as compelling before the jury as Scott's equivocal statements.

We sustain point of error five and on this point, reverse and remand for retrial.