

# NUMBER 13-11-00060-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**DANIEL GILBERTO RAMIREZ PEREZ,**                     **Appellant,**

**v.**

**THE STATE OF TEXAS,**                     **Appellee.**

### On appeal from the 398th District Court
### of Hidalgo County, Texas.

# MEMORANDUM OPINION

### Before Justices Garza, Benavides, and Perkes
### Memorandum Opinion by Justice Perkes

Appellant Daniel Gilberto Ramirez Perez appeals his conviction for murder, a first-degree felony.   *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011).   A jury found appellant guilty and assessed punishment at forty years' imprisonment in the Texas Department of Criminal Justice, Institutional Division.   By sixteen issues, which he

argues in four sections, appellant contends that the trial court erred because: (1) the evidence is insufficient to support his conviction; (2) the State failed to disclose impeachment evidence; (3) the State made improper jury argument; and (4) trial counsel rendered ineffective assistance. We affirm.[1]

## I. BACKGROUND

Summer Meland and appellant were involved in a romantic relationship. Appellant, however, was married to another woman, Virginia Garcia.[2] Defense witnesses claimed that Meland knew about Garcia early in the relationship. Doriana Salinas and Veronica Villarreal, two of Meland's friends, testified that Meland did not find out that appellant was married until very late in Meland's pregnancy with appellant's child.

Villarreal testified that in September 2008, when Meland's and appellant's child was about two months old, Meland wrote appellant a letter in which she "gave [appellant] an ultimatum . . . either he left his wife or it was over." Later that week, on September 26, Meland informed appellant through text messages that she would end the relationship unless he left Garcia. Meland gave appellant until 5:00 p.m. that evening to make a decision. Meland was found dead the next morning.

Several witnesses testified that appellant physically abused Meland during their relationship. The assistant principal at the junior high school where Meland was a teacher related that Meland would come to school with black eyes and injuries. The assistant principal and the security officer for the junior high school testified that Meland

---

[1] We reorganized appellant's issues for clarity in our discussion and as collectively argued by appellant. Because this is a memorandum opinion and the parties are familiar with the facts, we will not recite them here except as necessary to advise the parties of the Court's decision and the basic reasons for it. *See* TEX. R. APP. P. 47.4.

[2] Garcia testified she was appellant's common-law wife; other witnesses identified her as his wife.

told them appellant was beating her. Javier Barbosa, M.D., recounted that Meland came to him with a fractured leg and that she told him an unbelievable story regarding how it was fractured. Salinas testified that the leg was fractured while Meland and appellant were arguing.

Two witnesses related that in August 2008, Meland had some friends over at her house. Both witnesses testified that appellant "busted" or "barged" through the front door, stared at Meland's guests, and then exited the home. Abagail Gonzalez, one of Meland's friends, testified that appellant thereafter repeatedly called Meland's cell phone, and appellant called Gonzalez after Meland began ignoring his calls. He told Gonzalez that "if she doesn't answer my f_ing call, I'm going to shoot all of you guys. I have a gun." Gonzalez and the other witness stated appellant then approached another door with burglar bars, began shaking the bars, threw his cell phone in the house, and, according to Gonzalez, demanded that they open the door. Gonzalez called the police.

Gonzalez testified that on another occasion, about one week before Meland was killed, Meland told her that appellant threatened her with a knife. Gonzalez and Villarreal testified that a couple of days before Meland was killed, they had to pick her up from a parking lot, where she was hiding from appellant after he, according to Villarreal, became "very upset" with Meland because she answered a cell phone call from his wife.

Meland's mother testified that on September 25, which was during the week that Meland wrote appellant a letter threatening to break up with him, Meland told her that appellant "threatened to kill her, that he told her if he wasn't going to be with her, she

3

wasn't going to live." Meland texted appellant the ultimatum the next day. She was found dead the following day.

Meland was shot in the face from close range in the middle of the night while she was in bed. Her bedroom window was shattered, but crime scene investigators deduced that someone broke the window from inside the room. They found blood on the inside portion of the curtain that covered the window. Rene Avendano Jr., a crime scene investigator, testified that the blood on the curtain appeared fresh and that he thought the curtain was used "as a buffer to break the glass." There was no other sign of forced entry, and nothing was taken from the house.

Meland's live-in housekeeper, Angela Mendez Rosas ("Mendez"),[3] slept in a bedroom across the hall from Meland. She claimed that she did not hear anything that night. Mendez testified that Meland went out with some friends, leaving Mendez to care for the children, including the young baby. The paternal grandmother of Meland's two older children picked them up at about 8:00 p.m., and they stayed with her that night. Mendez stated she took the baby to her room and fell asleep around midnight. Meland came home around 2:00 a.m. and took the baby from Mendez's bedroom. Mendez found Meland dead the next morning.

Officer Rafael Ramirez, the lead investigator, testified that "immediately the name of Daniel Perez [appellant] was brought out as a person of interest."[4] Appellant agreed to talk to Ramirez and gave a signed statement detailing "his whereabouts and alibi as to

---

[3] The parties referred to Angela Mendez Rosas as Mendez throughout the trial and in the appellate briefs. We retain the designation for clarity.

[4] Officer Ramirez explained, "[T]he term person of interest is used when someone believes, based on their personal knowledge of events or previous events, that this person may have either information about the crime or may in some way be involved in the crime."

4

why he couldn't have committed the crime." Appellant told Ramirez that he did not own a gun. He stated that on September 26 he took Garcia to Fast Eddie's pool hall at 11:00 p.m. and that he stayed there until 2:45 a.m. on September 27. From there, appellant went straight home, picked up his children, left at 3:30 a.m., and drove directly to South Padre Island. According to appellant's statement, he had planned about a week prior to take the family to Schlitterbahn Water Park on September 27 because it was "the last weekend that the water park was going to be open for the summer." Appellant stated he arrived at South Padre Island around 4:50 a.m. and checked into a hotel around 5:50 a.m.

Appellant's family members generally confirmed appellant's version of the evening's events. Garcia testified that she and appellant went from Fast Eddie's to their house, and that they stayed at their house until they left for South Padre Island. She claimed they had been planning for weeks to go to Schlitterbahn. She emphasized that appellant never left the house until they left together to go to South Padre Island.

Breck Christopher McDaniel testified as an expert on cellular telephone antenna coverage. He analyzed appellant's cell phone records to see what cell phone antennas the cell phone used in receiving phone calls and texts that evening. McDaniel testified that at 9:21 p.m. on September 26 appellant's cell phone used a cell antenna consistent with appellant being at Fast Eddie's and that at 2:38 a.m. and 2:47 a.m. on September 27, appellant's cell phone used antennas consistent with appellant driving back to his house. McDaniel testified that "[b]etween 3:46 and 26 seconds a.m. and 3:48 and 5 seconds a.m. on Saturday morning . . . [appellant's] phone was utilizing antennas that are consistent with being at or very close to the victim's home." At 4:05 a.m., appellant's cell phone

5

used an antenna consistent with him being back at his house. Between 4:37 a.m. and 5:24 a.m., appellant's cell phone used "a number of cell antennas," and it moved "from the area of McAllen, and it goes east to southeast ending up by 5:24 a.m. utilizing a cell antenna on South Padre Island." Comparing cell phone data to appellant's statement, McDaniel commented:

> [H]e—the phone did not go directly home and then on to South Padre Island as the statement claims. The phone went around his home and then went back to the north/northwest after that and then went back around his home and then off to South Padre Island area later that morning.

The State admitted a Schlitterbahn brochure which showed Schlitterbahn was already closed for the season by September 27. Phillip Adam Stout, a forensic scientist from the Texas Department of Public Safety Crime Laboratory's trace evidence section, testified that investigators recovered "three particles indicative[5] of gunshot primer residue" from appellant's vehicle. During cross-examination, Stout acknowledged he had read studies showing that the three elements of gunshot residue could possibly be detected on brake pads and in brake dust. According to appellant's sister, appellant would come into contact with those elements on a daily basis because his job involved grinding brakes. Stout noted, however, "that research was done in Europe, and similar research has been conducted here but they haven't found all three." Stout also clarified, "When we're looking at these particles, we are looking to make sure . . . that these components are contained within the same particle and the particle is melted . . . ."

Edna Lissette Zavala, a forensic scientist with the Texas Department of Public Safety Crime Laboratory, testified that "[t]o a reasonable degree of scientific certainty,

---

[5] Stout explained, "We call the three-component that have lead, barium and antimony, we call it characteristic. And indicative refers to particles that contain two of the elements."

6

Daniel Perez [appellant] is the source of the apparent blood stain" on the window-side of the curtain that covered the shattered bedroom window. Appellant told the police in a statement that he must have left the blood on the curtain sometime in the past.

## II. SUFFICIENCY OF THE EVIDENCE

By his fourteenth through sixteenth issues, appellant challenges the sufficiency of the evidence to support his conviction. Appellant invites this court to review the evidence under three standards: no evidence, factual insufficiency, and legal insufficiency. The Texas Court of Criminal Appeals, in *Brooks v. State*, requires us to review all evidentiary challenges under the *Jackson v. Virginia* sufficiency standard. 323 S.W.3d 893, 894, 917 (Tex. Crim. App. 2010) (plurality op.); *Caminorreal v. State*, 374 S.W.3d 479, 482 (Tex. App.—Corpus Christi 2010, no pet.). Appellant claims *Brooks* is inconsistent with our responsibility under the Texas Constitution and invites us to disregard it. We decline appellant's invitation; "we are duty bound to follow precedent issued by the Texas Court of Criminal Appeals in this matter." *Kiffe v. State*, 361 S.W.3d 104, 109 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *Ervin v. State*, 331 S.W.3d 49, 53 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd)).

### A.  Standard of Review

"The standard for determining whether the evidence is legally sufficient to support a conviction is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Johnson v. State*, 364 S.W.3d 292, 293–94 (Tex. Crim. App. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original);

*see Brooks*, 323 S.W.3d at 898–99.   The fact-finder is the exclusive judge of the credibility of witnesses and of the weight to be given to their testimony.   *Anderson v. State*, 322 S.W.3d 401, 405 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (citing *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008)).   Reconciliation of conflicts in the evidence is within the fact-finder's exclusive province.   *Id.*  (citing *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000)).   We must resolve inconsistencies in the testimony in favor of the verdict.   *Id.* (citing *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000)).

We measure the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge.   *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).   Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.   *Id.*   A person commits murder if he intentionally or knowingly causes the death of another individual.   TEX. PENAL CODE ANN. § 19.02(b)(1).

## B.    Discussion

A review of appellant's relationship with Meland provides a probative context. Several witnesses testified that appellant physically abused Meland and related several occasions during which he seriously injured her.   During at least one event, the police were called after appellant became violently abusive and threatened to kill everyone with his gun.   Appellant, however, denied owning a gun in his statement.   Meland's friends

testified that earlier in the week, Meland wrote appellant a letter threatening to end the relationship unless he left his wife. Meland's mother testified Meland told her that appellant "threatened to kill her[;] if he wasn't going to be with her, she wasn't going to live." The next day, Meland sent appellant a text message stating she would end the relationship if he refused to leave his wife. Meland was found dead the next morning.

The evidence connecting appellant to Meland's murder includes appellant's blood on the curtain covering the bedroom window shattered on the night of Meland's murder. The evidence further includes testimony and data showing that appellant's cell phone was at or near Meland's house between 3:46 and 3:48 a.m., which, based on the forensic pathologist's testimony, fell within the time range for Meland's death. That appellant's cell phone was at or near Meland's house at that time also contradicted appellant's version of the events in his statement. In addition, three particles indicative of gunshot residue were found in appellant's vehicle.

In considering the foregoing evidence, the jury heard two competing explanations. Although appellant suggested he could have left his blood on the curtain sometime in the past, Investigator Avendano Jr. testified that the blood looked fresh. Contrary to appellant's assertion that he drove directly from Fast Eddie's to his house and then to South Padre Island, McDaniel's testimony showed that appellant's cell phone was at or near Meland's house sometime during that time period. Appellant claimed in his statement that he planned for about a week to drive to South Padre Island on September 27 to visit Schlitterbahn on its last open weekend, but the State presented evidence showing that Schlitterbahn was not open on that day, something that planning in advance

9

should have revealed to appellant. Appellant also told investigating officers that he never owned a gun, but Gonzalez related an event in which appellant threatened to shoot Meland and some of her house guests, specifically stating, "I have a gun."

We defer to the jury as the exclusive judge of the witnesses' credibility and the weight to be given their testimony, and will uphold the jury's reconciliation of conflicts in the evidence unless, after viewing the evidence in the light most favorable to the prosecution, we conclude that no rational jury could have found the essential elements of murder beyond a reasonable doubt. *Johnson*, 364 S.W.3d at 293–94; *Anderson*, 322 S.W.3d at 405. The jury was free to disbelieve appellant's version of events.

We hold that a reasonable jury could have found the essential elements of murder beyond a reasonable doubt. *See id.* We overrule appellant's fourteenth through sixteenth issues.

### III. MOTION FOR NEW TRIAL

By his first through ninth issues, appellant argues that the trial court abused its discretion by not granting his motion for new trial because: "(a) the State's suppression of material impeachment information undermined confidence in the trial's outcome; and (b) the State's [failed] to request the trial court to instruct the jury to disregard false impression testimony from the State's witness[,] Mendez." In his motion for new trial and at the hearing, appellant argued the State improperly withheld two prior statements made by Mendez, Meland's housekeeper, in violation of *Brady v. Maryland*[6] and that the State failed to correct testimony by Mendez which the State knew to be false in violation of

---

[6] *Brady v. Maryland,* 373 U.S. 83 (1963).

*Alcorta v. Texas*.[7]   Appellant reasserts these arguments on appeal and challenges some of the trial court's findings of fact that support its denial of appellant's motion for new trial.[8]

## A.   Standard of Review

*Riley v. State* delineates our standard of review when considering motions for new trial, and states, in relevant part:

> An appellate court reviews a trial court's denial of a motion for new trial for an abuse of discretion, reversing only if the trial judge's opinion was clearly erroneous and arbitrary.   A trial court abuses its discretion if no reasonable view of the record could support the trial court's ruling.   This deferential review requires the appellate court to view the evidence in the light most favorable to the trial court's ruling.   The appellate court must not substitute its own judgment for that of the trial court and must uphold the trial court's ruling if it is within the zone of reasonable disagreement.   Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous.

378 S.W.3d 453, 457 (Tex. Crim. App. 2012) (quotations omitted).

Appellate issues involving claims originally brought in a motion for new trial are really challenges to the trial court's ruling on the motion.   *Cueva v. State*, 339 S.W.3d 839, 856–57 (Tex. App.—Corpus Christi 2011, pet. ref'd) (citing *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004)).   We defer to the trial court as the sole judge of the credibility of the witnesses and the weight to be given their testimony.   *See Rodriguez v. State*, 191 S.W.3d 428, 453 (Tex. App.—Corpus Christi 2006, pet. ref'd).

---

[7] *Alcorta v. Texas*, 355 U.S. 28 (1957).

[8] Most of appellant's briefing on this issue corresponds to a "statement" written by a polygraph examiner in a post-examination report about Mendez, whom the examiner declared showed deception during the examination.   The other allegedly suppressed statement was mentioned only once during the hearing, and the only reference to it in appellant's brief is a verbatim quotation, without any argument, of the testimony advanced at the hearing.   Appellant does not explicitly attach any of the articulated subissues to that statement as he does to the post-polygraph examination observation.   The attorneys at the hearing did not discuss the second statement in closing, and none of the trial court's findings of fact address it.

## B.    Texas Rule of Evidence 615(a)

By his first issue, appellant claims the State violated Texas Rule of Evidence 615(a) by only tendering one of Mendez's prior statements to appellant after direct examination, thereby withholding "her 'other two statements' in the DA's file."  Rule 615(a) pertains to the production of a direct-examination witness's statements upon motion.  TEX. R. EVID. 615(a).  Appellant did not argue this issue at trial, in his motion for new trial, or at the hearing on his motion for new trial.  Therefore, he failed to preserve this issue for review on appeal.  *See* TEX. R. APP. P. 33.1; *Keeter v. State*, 175 S.W.3d 756, 760 (Tex. Crim. App. 2005) (holding that the defendant's failure to include an argument in his motion for new trial and at its hearing rendered it unpreserved); *Acosta v. State*, 160 S.W.3d 204, 211 (Tex. App.—Fort Worth 2005, no pet.).[9]  We overrule appellant's first issue.

## C.    *Brady v. Maryland*

By his second issue, appellant argues the trial court reversibly erred by denying his motion for new trial, wherein he complained that the State's failure to tender two of Mendez's prior statements violated the Sixth and Fourteenth Amendments.  *See* U.S. CONST. amends. VI, XIV; *Brady v. Maryland*, 373 U.S. 83 (1963).[10]  Specifically,

---

[9]   To the extent appellant categorizes Texas Rule of Evidence 615(a) as an extension of the State's responsibility under *Brady*, we analyze appellant's *Brady*-violation complaint in the following subsection.  As an independent ground for recovery, however, appellant failed to preserve his Rule 615(a) objection.  Moreover, rule 615(a) is inapplicable because appellant did not move for production of a statement as required by rule 615(a), and the post-polygraph examination summary was not a "statement" as defined in rule 615(f).  *See* TEX. R. EVID. 615(a), (f).

[10]   Appellant does not develop his Sixth Amendment argument in his brief except to conclusorily assert at the beginning and end of his argument that it has been violated.  Moreover, the controlling cases, upon which appellant properly relies, are Fourteenth Amendment cases.  We overrule appellant's Sixth Amendment argument as inadequately briefed.  *See* TEX. R. APP. P. 38.1.

appellant complains that the State did not tender: (1) Officer Flores's post-polygraph report that appellant describes as a "recantation statement"; and (2) Mendez's two-page affidavit dated September 27, 2008.[11]

*Brady v. Maryland* established "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. To prevail on a *Brady*-violation claim, the defendant must show: (1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith; (2) the withheld evidence is favorable to him; and (3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. *Pena v. State*, 353 S.W.3d 797, 809 (Tex. Crim. App. 2011) (citing *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002)); *Rodriguez v. State*, 191 S.W.3d 428, 472 (Tex. App.—Corpus Christi 2006, pet. ref'd).

Two principles guide our analysis of the first *Brady* prong. First, appellant has to show that the evidence was known to the prosecution but unknown to the defense. *Ex parte Miles*, 359 S.W.3d 647, 665 (Tex. Crim. App. 2012) (citing *United States v. Agurs*, 427 U.S. 97, 103 (1976)). Second, an open-file policy generally satisfies the State's duty to disclose exculpatory evidence. *See Harm v. State*, 183 S.W.3d 403, 407 (Tex. Crim. App. 2006) (en banc). "[T]he [S]tate is not required to seek out exculpatory evidence

---

[11] Appellant filed pretrial requests for the State to disclose and to produce all witness statements and material evidence regarding his innocence. It is undisputed the State tendered one of Mendez's statements, dated September 28, 2008. Appellant challenges whether the State did, in fact, tender the other two "statements."

independently on appellant's behalf, or furnish appellant with exculpatory or mitigating evidence that is fully accessible to appellant from other sources." *Id.* (citing *Jackson v. State*, 552 S.W.2d 798, 804 (Tex. Crim. App. 1976)).

### 1. Officer Flores's Post-Polygraph Report

Appellant argues the trial court erred by denying his motion for new trial because the State allegedly withheld Officer Flores's post-polygraph report. The question of whether the State failed to disclose Officer Flores's post-polygraph report was a question of fact for the trial court. The State denied withholding the report, emphasizing that it was located in the State's file, which was available to and used by appellant's trial counsel in accordance with the State's open-file policy. The State asserted that appellant's counsel knew about the report before trial, as manifested by a question he asked the State's investigator, Officer Ramirez, on cross-examination. Specifically, during the trial, appellant's counsel asked Officer Ramirez, "[B]ased on the information that you gathered, [Mendez] was being deceptive; is that right?"[12] In that regard, the report includes a comment line regarding the "Examiner's Opinion" wherein the examiner concludes: "Deception Indicated."

Appellant, on the other hand, urged that the polygraph report must not have been included in the State's file because, according to appellant's counsel, "I would not have missed that . . . It's pretty critical stuff." The trial court concluded, as explained in its findings of fact, that the trial counsel's question and bill of exceptions revealed his awareness of the report. Separately, the trial court found that the prosecutor "provided credible testimony" that the report was always available in the State's open file.

___

[12] The question was not answered because the State objected to it.

We defer to the trial court's determination on the witnesses' credibility, *see, e.g.*, *Rodriguez*, 191 S.W.3d at 453, and we defer to the trial court's selection between the two views of evidence, *see Riley*, 378 S.W.3d at 457 (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)). Deferring to the trial court's finding that appellant's counsel was aware of the report prior to trial, we hold that appellant failed to satisfy the first *Brady* prong. *See Ex parte Miles*, 359 S.W.3d at 665 (citing *Agurs*, 427 U.S. at 103) (noting that an appellant must show that the evidence "had been known to the prosecution but unknown to the defense."). Further, after deferring to the trial court's finding that the report was in the State's file and available to appellant, we hold that appellant also failed to satisfy the first *Brady* prong under *Harm*. *See Harm*, 183 S.W.3d at 407 (open-file policy generally satisfies State's *Brady* duty).[13]

Appellant's reliance on *Banks v. Dretke*, 540 U.S. 668 (2004) for the proposition that the State has a duty beyond maintaining an open-file policy to identify and provide the defense with exculpatory evidence is misplaced. In that case, the United States Supreme Court rejected the "notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Id*. at 695. The *Brady* material challenged in *Banks* was "undisclosed" and "the State persisted in hiding" *Brady* material while telling the defense "that it had complied in full with its *Brady* disclosure obligations . . . ." *Id.* at 693. *Banks* does not

---

[13] The trial court's findings also indicate that the statement was not material under *Brady*. We agree. There is no showing that had the information been produced, the trial outcome would have been different. Although appellant asserts that the defense would have argued the murderer was in the house at midnight, appellant has not shown how that defensive theory would negate the fact that, according to McDaniel's analysis of appellant's cell phone location, appellant was at or near Meland's home at around the time of her death. Appellant does not show why the defense witnesses' testimony of appellant being elsewhere would be more credible to the jury in that circumstance. Neither does it explain why appellant's DNA was found on the curtain by the broken window.

establish that prosecutors must assist the defense and direct its attention to or emphasize *Brady* material that is already disclosed in the State's open file.   We overrule this portion of appellant's second issue.

### 2.    Mendez's Affidavit Dated September 27, 2008

Appellant further argues the trial court erred by denying his motion for new trial because the State allegedly withheld Mendez's two-page affidavit dated September 27, 2008.   Upon being asked when he first saw the affidavit, appellant's trial counsel responded, "Well, I may have seen it, but I don't recall.   I can tell you that when I looked at this stuff yesterday, I could not remember reading this document in the . . . D.A.'s file." Appellant's counsel testified that following Mendez's direct examination at trial, the prosecutor only handed him the September 28 affidavit.   In counsel's testimony from the hearing, he explains the relevance of the September 27 statement:

> There is a couple of differences.   First of all, in the—the one dated September 27, 2008, she talks about an alarm system that she didn't recall, Ms. Mendez didn't recall that Ms. Meland activated the system, the alarm system or not, when she came home.   On the one the following day, she corrected it and says that she never used the alarm system.   There is a big difference there.

Trial counsel emphasized that, had he been given the September 27 statement,

> I would have asked her about the alarm system because, you know, the one that I saw dated September 28th, 2008, the clear indication is that even though there was an alarm system in the house, it was never, ever used. The one dated September 27, 2008 indicates that there was one alarm system in the house that was activated from time to time.   At least that's the clear inference from that statement.   And I would have pursued the questioning as to whether or not the alarm's system was activated when she got home, when Ms. Meland got home at 2:00 in the morning.

16

Appellant does not give the affidavit separate treatment in his brief, except to quote the foregoing testimony from the hearing on his motion for new trial. After quoting it, however, appellant articulates no additional argument relating solely to it, but rather quotes testimony relating to the post-polygraph report.

Appellant has failed to satisfy the three *Brady* prongs as they relate to this statement. Appellant's trial counsel admitted that he may have seen the statement but could not recall whether he had. Failure to recall does not constitute non-disclosure. Moreover, the September 27 affidavit does not constitute evidence favorable to appellant or material evidence. *See Brady*, 373 U.S. at 87. We overrule the remainder of appellant's second issue.

**D.    *Alcorta v. Texas***

By his third issue, appellant argues the trial court reversibly erred by denying his motion for new trial, wherein he complained that the State violated the Sixth and Fourteenth Amendments by not requesting the trial court to instruct the jury to disregard Mendez's allegedly false-impression testimony.[14] *See* U.S. CONST. amends. VI, XIV; *Alcorta v. Texas*, 355 U.S. 28 (1957).

The Fourteenth Amendment precludes the State from using perjured testimony that the prosecution knows to be perjury. *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (per curiam); *Ex parte Chabot*, 300 S.W.3d 768, 770–71 (Tex. Crim. App. 2009). *Alcorta v. Texas* expanded this right, making it a due process violation for a prosecutor to not correct false testimony. *See* 355 U.S. 28, 31–32 (1957) (per curiam); *see also Napue v.*

---

[14]    Again, we overrule appellant's Sixth-Amendment argument as inadequately briefed. *See supra* note 10; TEX. R. APP. P. 38.1.

*Illinois*, 360 U.S. 264, 269 (1959) (explaining *Alcorta*); *Ex parte Castellano*, 863 S.W.2d 476, 480 (Tex. Crim. App. 1993) (en banc); *Garcia v. State*, No. 13-10-00098-CR, 2011 WL 861156, at *8 (Tex. App.—Corpus Christi Mar. 10, 2011, no pet.) (mem. op., not designated for publication). The State's duty to correct false testimony applies even when the falsehood in the testimony goes only to the witness's credibility, *see Napue*, 360 U.S. at 239, and even when the prosecution did not actually know the falsity of testimony but should have, *see Giglio v. United States*, 405 U.S. 150, 154 (1972); *Ex parte Adams*, 168 S.W.2d 281, 291 (Tex. Crim. App. 1989) (en banc).

We do not "automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict . . . ." *Giglio*, 405 U.S. at 154 (quotation omitted); *see Ex parte Adams*, 168 S.W.2d at 292. "A new trial is required if the 'false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .'" *Giglio*, 405 U.S. at 154 (citing *Napue*, 360 U.S. at 271); *see Ex parte Adams*, 168 S.W.2d at 292.

Appellant claims that the following testimony from Mendez was false and that the State knew it was false because it allegedly contradicted the polygraph examiner's post-examination notes:

> Q    After Ms. [Meland] left, the kids left, do you recall at what time you made his [the baby's] last bottle?
>
> A    Yes, at midnight.
>
> Q    And at that point did you feel anything strange?
>
> A    No.   Well, that night I felt scared.

18

Q      And that night did you see anything, did you hear anything that you felt that fear?

A      No, no, nothing, but I did feel scared.

Q      Okay.   And since you felt that scaredness or that fear, what did you do to feel more secure?

A      I picked up the keys that were there on top of the counter.   I picked them up and I went to go lock the doors.

Q      What doors was it that you locked, Ms. Mendez?

A      To the main entrance.

. . . .

Q      Okay.   So which doors were commonly always left open at the Meland's home?

A      The one—the garage.

Q      And it was common to you that those were usually left unlocked?

A      Yes, because that's where she [Meland] would come in through.

Q      So you didn't lock them that night, correct?

A      No, no.

The polygraph examiner's post-examination summary stated:

Mendez denies seeing or hearing anything suspicious or out of the ordinary. She recanted saying that about midnight, she was in the kitchen fixing the baby a bottle when she heard a sound behind her.   She looked and didn't see anyone behind her.   She and her sister spoke about this and suspect that this is when someone entered the house.   She added that she locked the front outer door because she was scared but left the rear door unlocked.

The State prosecutor considered the discrepancies to be minor and explained that

it was not uncommon for witnesses to give slightly different versions of events.   The trial

19

court agreed with the State, finding that the prosecutor "accurately described the discrepancy between Angela Mendez'[s] trial testimony and the information given following the first polygraph session as a minor discrepancy involving saying the same thing a little bit differently." The trial court further reasoned that the post-polygraph narrative did not necessarily place the alleged sound inside the house and, in both versions, Mendez felt scared and locked the front door. In an un-appealed finding of fact, the trial court elaborated:

> The claim that the prosecution violated its duty to correct allegedly false testimony . . . is based on the false assumptions (A) that [Mendez's] trial testimony and the information contained in the interview following her first polygraph session are 180 degrees different, making one the truth and the other a lie and (B) that the State had to accept as true the version of events which is favorable to the defense.

We agree with the trial court. We note that the prior "statement" was not from Mendez; it was from the polygraph examiner, who was recounting Mendez's discussion with him. Accordingly, some inconsistencies may be expected. Moreover, the prior statement indicated that Mendez thought she heard something behind her, but, upon inspection, saw nothing. This comports with her trial testimony that she felt scared but did not identify a particular sight or sound that prompted the fear. Mendez never said, in any recorded statement, that she heard someone inside the house, which would make her response of locking herself in the house rather curious.

Viewing the evidence in the light most favorable to the trial court's denial of appellant's motion for new trial, we cannot conclude that no reasonable view of the record supports the ruling. *See Riley*, 378 S.W.3d at 457. To the extent her testimony varied from the examiner's narrative of her statements, we hold that the minor discrepancies did

20

not amount to false testimony or perjury.[15]  *See Lawson v. State*, 896 S.W.2d 828, 832–33 (Tex. App.—Corpus Christi 1995, pet. ref'd) (holding minor discrepancies between a police officer's testimony in a previous trial and the later retrial did not constitute perjury); *see also Losada v. State*, 721 S.W.2d 305, 312 (Tex. Crim. App. 1986) (en banc) ("Discrepancies in testimony alone do not make out a case for perjury.").   Even if we were to assume that Mendez's testimony amounted to perjury, we do not think it would have been reasonably likely to affect the jury's verdict   *See Giglio*, 405 U.S. at 154; *Ex parte Adams*, 168 S.W.2d at 292.   Substantial evidence connected appellant to the crime.   We overrule appellant's third issue.

## E.     Findings of Fact

By issues four through nine, appellant argues that the trial court "clearly erred" in making findings of fact numbers 21, 24, 32, 54, 55, and 56.   Appellant supports his assertion with a single statement:   "Those facts or conclusions are untrue, appellant proved by clear and convincing evidence."

Appellant wants us to substitute the trial court's findings with our own judgment, which we are not permitted to do.   *See Riley*, 378 S.W.3d at 457 (citing *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007); *Wead v. State*, 129 S.W.3d 126, 129 (Tex.

---

[15]   Appellant's attorney stressed that, had he been aware of the prior statement, he would have "argued to the jury that the individual that killed Summer Meland was at the house at midnight" and "there was no way that [appellant] would have been in that house at midnight . . . ."   That appellant would have argued differently at trial had he been aware of the prior statement is relevant to the non-disclosure prong of *Brady*, addressed *supra*, more than whether the testimony was perjury.   We review the alleged inconsistency from the perspective of the fact-finder, not the defense.   *See Giglio v. United States*, 405 U.S. 150, 154 (1972) ("A new trial is required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.") (internal quotations omitted); *Ex parte Adams*, 768 S.W.2d 281, 292 (Tex. Crim. App. 1989) (en banc) (same); *Duggan v. State*, 778 S.W.2d 465, 469 (Tex. Crim. App. 1989) (en banc) ("[F]alse evidence, left uncorrected, can mislead the fact-finder, thereby misdirecting the due course of law and diverting due process from its intended progression toward a just and fair trial.").

Crim. App. 2004)) ("The appellate court must not substitute its own judgment for that of the trial court and must uphold the trial court's ruling if it is within the zone of reasonable disagreement."). We will not disturb the trial court's findings absent demonstrated abuse of discretion. *Tollett v. State*, 799 S.W.2d 256, 259 (Tex. Crim. App. 1990) (en banc) (citing *Keady v. State*, 687 S.W.2d 757, 759 (Tex. Crim. App. 1985)); *Clarke v. State*, 305 S.W.3d 841, 846 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (citation omitted); *Martinez v. State*, 846 S.W.2d 348, 349 (Tex. App.—Corpus Christi 1992, pet. ref'd).

Looking at the contested findings, we uphold them as within the zone of reasonable disagreement. *See Riley*, 378 S.W.3d at 457. Finding 21 found credible the State's description of the alleged inconsistency between Mendez's testimony and the post-polygraph narrative as a minor discrepancy. Finding 24 declared, as an alternative to the court's finding that the State disclosed the statement, that even if the polygraph examination had not been disclosed to appellant, it would not have affected the trial's outcome because the evidence convicting appellant was overwhelming and gave no indication that anyone other than appellant was at or near Meland's home. Finding 32 noted that appellant's attorney provided no evidence except his own recollection that the State offered only one statement rather than all of Mendez's germane statements to the defense after examining Mendez. Findings 54, 55, and 56 found, as an alternative to the finding the State disclosed the statement, that the statement was not material.

Given that findings of fact 24, 54, 55, and 56 were presented as alternative findings to the court's finding that the State disclosed in its open file the allegedly suppressed statement, and that we have identified no abuse of discretion on that finding, we need not

22

independently address the alternative findings.   *See* TEX. R. APP. P. 47.1.   We hold the trial court did not abuse its discretion in making the complained-of findings of fact.   We overrule appellant's fourth through ninth issues.

## IV.  CLOSING ARGUMENT

By his twelfth issue, appellant contends the trial court erred in overruling his objection to the State's allegedly prejudicial jury argument commenting on appellant's failure to testify.   By his thirteenth issue, appellant argues the trial court erred by denying his motion for mistrial made in response to a different jury-argument comment on appellant's failure to testify.

### A.    Applicable Law

The four permissible areas of jury argument are:   (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) responses to the defendant's argument; and (4) pleas for law enforcement.   *Freeman v. State*, 340 S.W.3d 717, 727 (Tex. Crim. App. 2011); *Lopez v. State*, 288 S.W.3d 148, 159–60 (Tex. App.—Corpus Christi 2009, pet. ref'd).   The fact that a defendant did not testify does not fall into any of those categories and may not be the subject of comment by the prosecution.   The United States and Texas Constitutions guarantee that a defendant in a criminal trial shall not be compelled to give evidence against himself.   *See* U.S. CONST. amend. V; TEX. CONST. art. I.   The decision of a defendant to not testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel.   TEX. CRIM. PROC. CODE ANN. art. 38.08 (West 2005).

> To violate the right against self-incrimination, the offending language must
> be viewed from the jury's standpoint and the implication that the comment

23

referred to the defendant's failure to testify must be clear. It is not sufficient that the language might be construed as an implied or indirect allusion. The test is whether the language used was manifestly intended or was of such character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify. In applying this standard, the context in which the comment was made must be analyzed to determine whether the language used was of such character.

*Cruz v. State*, 225 S.W.3d 546, 548 (Tex. Crim. App. 2007); *see also Bustamante v. State*, 48 S.W.3d 761, 764 (Tex. Crim. App. 2001). A jury argument is improper if it calls the jury's attention to the absence of evidence that only the defendant's testimony could supply. *Fuentes v. State*, 991 S.W.2d 267, 275 (Tex. Crim. App. 1999) (citing *Banks v. State*, 643 S.W.2d 129, 134–35 (Tex. Crim. App. 1982)); *Crocker v. State*, 248 S.W.3d 299, 304 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (citing *Garrett v. State*, 632 S.W.2d 350, 353 (Tex. Crim. App. 1982)).

We review challenges to overruled objections of improper jury argument, such as an improper comment on a defendant's decision to not testify, for an abuse of discretion. *See Garcia v. State*, 126 S.W.3d 921, 924 (Tex. Crim. App. 2004); *York v. State*, 258 S.W.3d 712, 717 (Tex. App.—Waco 2008, pet. ref'd). We also review the trial court's ruling on a motion for mistrial under the abuse-of-discretion standard. *See Webb*, 232 S.W.3d at 112. We view the evidence in the light most favorable to the trial court's ruling and uphold the ruling if it is within the zone of reasonable disagreement. *See id.* (citing *Wead*, 129 S.W.3d at 129).

A mistrial is a severe remedy, and "[o]nly in extreme circumstances, where the prejudice is incurable, will mistrial be required." *Hawkins v. State,* 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (en banc). "A mistrial is the trial court's remedy for improper

24

conduct that is 'so prejudicial that expenditure of further time and expense would be wasteful or futile.'" *Id.* (quoting *Ladd v. State,* 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)). "Therefore, a mistrial should be granted only in the cases where the 'reference was clearly calculated to inflame the minds of the jury or was of such damning character as to suggest it would be impossible to remove the harmful impression from the juror's minds.'" *Young v. State,* 283 S.W.3d 854, 878 (Tex. Crim. App. 2009) (quoting *Rojas v. State,* 986 S.W.2d 241, 250 (Tex. Crim. App. 1998)). Otherwise, sound discretion normally requires the trial judge to consider less drastic alternatives. *Torres v. State,* 614 S.W.2d 436, 442 (Tex. Crim. App. [Panel Op.] 1981). In determining whether a mistrial should have been granted, three factors must be balanced:

1. The severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks);

2. The measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and

3. The certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction).

*Archie v. State*, 221 S.W.3d 695, 700 (Tex. Crim. App. 2007) (citing *Ramon v. State*, 159 S.W.3d 927, 929 (Tex. Crim. App. 2004)).

## B. Discussion

### 1. No Explanation Regarding Cell Phone Pinging At The Crime Scene

By his twelfth issue, appellant contends that the trial court erred by overruling his objection to the State's following jury-argument comment:

He cannot explain whatsoever why he [his cell phone] was pinging off Summer Meland's home in the middle of the night.

Appellant objected on the grounds that the State was improperly commenting on appellant's exercised right to not testify. The trial court overruled his objection.

We hold that the argument was not a clear reference from which the jury would necessarily and naturally conclude that the prosecutor was commenting on appellant's decision to not testify. *See Cruz*, 225 S.W.3d at 548. Portrayal of the argument to be such a reference constitutes implication and construal rather than manifest intent. *See id.* Neither did the comment highlight the absence of evidence that only appellant's testimony could provide. *See Fuentes*, 991 S.W.2d at 275; *Crocker*, 248 S.W.3d at 304. At trial, defense witnesses asserted that appellant was traveling to South Padre Island at the time that McDaniel's testimony placed appellant at or near Meland's house. During closing argument, appellant's trial counsel questioned McDaniel's objectivity and emphasized that his testimony was limited to estimates and opinion, which, according to trial counsel, could be incorrect. Accordingly, the complained-of comment falls under summation of evidence and reasonable deductions drawn from the evidence. *See Freeman*, 340 S.W.3d at 727; *Lopez*, 288 S.W.3d at 159–60.

Even assuming that the argument was an improper comment on appellant's right to not testify, we hold that the failure to sustain appellant's objection would be harmless. A prosecutorial remark that impinges on a defendant's privilege against self-incrimination is an error of constitutional magnitude. *Snowden v. State*, 353 S.W.3d 815, 818 (Tex. Crim. App. 2011). When confronted with constitutional error, we must reverse unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a). This requires us to review the entire record in a

26

neutral, impartial, and even-handed manner rather than in "the light most favorable to the prosecution." *Harris v. State*, 790 S.W.2d 568, 586 (Tex. Crim. App. 1989), *disagreed with in part on other grounds by Snowden*, 353 S.W.3d at 820–22; *Trevino v. State*, 228 S.W.3d 729, 752 (Tex. App.—Corpus Christi 2006, pet. ref'd). In evaluating whether constitutional error was harmful, we consider: the nature of the error; the extent to which it was emphasized by the State; the probable implications of the error; and the weight the jury would likely have assigned to it in the course of its deliberations. *Snowden*, 353 S.W.3d at 822. These factors are not exclusive of other valid considerations, and not every factor will necessarily apply. *See id.*

Our neutral, impartial review of the record demonstrates that the prosecutor's comment was extremely brief and that the jury likely attributed little, if any, weight to the allegedly improper comment. Moreover, the trial court charged the jury to not afford any weight to appellant's decision to not testify. Thus, even assuming the trial court erred by overruling appellant's objection, we hold that such error was not reversibly harmful. We overrule appellant's twelfth issue.

### 2. No Explanation Regarding His Blood At The Crime Scene

By his thirteenth issue, appellant argues that the trial court erred by denying his motion for mistrial. Specifically, he complains that the State made a "prejudicial comment on appellant's right not to testify" when the State made the following comment during jury argument:

> They [the defense] want you to just forget that his blood is there at the scene, forget that it was there some other time. Give us an explanation.

Appellant objected on grounds the argument was an improper comment on appellant's right to not testify, and the trial court sustained his objection. Appellant asked the trial court to instruct the jury to disregard the comment, and the trial court so instructed the jury. The trial court, however, thereafter denied appellant's motion for mistrial, which appellant contests on appeal.

First, we note that the comment was of very short duration, referenced "they" rather than appellant, and was not repeated. Appellant immediately objected, and the trial court sustained the objection and instructed the jury to disregard. Thereafter, the prosecutor's argument focused on the implausibility of appellant's alibi.

Second, an instruction by the trial court for the jury to disregard will cure a comment on the failure of an accused to testify in all but the most blatant examples. *See Moore v. State*, 999 S.W.2d 385, 405 (Tex. Crim. App. 1999). Here, the trial court's instruction to disregard was in response to appellant's complaint that the comment breached appellant's right to not testify. The jury was aware of why the comment was improper and why the trial court ordered the jury to disregard it. We must assume, absent rebuttal, that the jury followed the instruction. *See Thrift v. State*, 176 S.W.3d 221, 224 & n.10 (Tex. Crim. App. 2005); *Waldo v. State*, 746 S.W.2d 750, 754 (Tex. Crim. App. 1988); *Gardner v. State*, 730 S.W.2d 675, 696 (Tex. Crim. App. 1987); *see also Banda v. State*, No. 13-10-00579-CR, 2012 WL 171918, at *7 (Tex. App.—Corpus Christi Jan. 19, 2012, pet. ref'd) (mem. op., not designated for publication). The error at issue was not so highly prejudicial that it could not be cured by the court's specific instruction to disregard the comment. *See Young v. State*, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004)

28

("A grant of a motion for mistrial should be reserved for those cases in which an objection could not have prevented, and an instruction to disregard could not cure, the prejudice stemming from the event at trial—i.e., where an instruction would not leave the jury in an acceptable state to continue the trial.").

Lastly, the evidence supporting appellant's conviction was strong regardless of the improper comment. As discussed *supra*, there was substantial evidence connecting appellant to the crime. The comment, even if improper, likely had very little impact on the trial's outcome. Therefore, we conclude the trial court did not abuse its discretion in overruling appellant's motion for mistrial. We overrule appellant's thirteenth issue.

## V.  INEFFECTIVE ASSISTANCE OF COUNSEL

By his tenth and eleventh issues, appellant argues he received constitutionally ineffective assistance of counsel because his trial counsel: (1) failed to impeach Mendez with her prior inconsistent statement; and (2) failed to impeach Mendez by presenting Officer Flores's testimony about Mendez's prior inconsistent statement to him. Appellant contends he was deprived of the defense that someone other than appellant was in the house and killed Meland. Both issues concern the following statement made by Officer Flores:

> [A]bout midnight [Mendez] was in the kitchen fixing the baby a bottle when she heard a sound behind her. She looked and didn't see anyone behind her. She and her sister spoke about this and suspect that this is when someone entered the house.

## A.    Standard of Review

To prevail on an ineffective assistance claim, appellant must show: (1) counsel's representation fell below an objective standard of reasonableness; and (2) the deficient

performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 689 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011); *Jaynes v. State*, 216 S.W.3d 839, 851 (Tex. App.—Corpus Christi 2006, no pet.). Our review of counsel's representation is highly deferential; we will find ineffective assistance only if he rebuts the strong presumption that his counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Lopez*, 343 S.W.3d at 142; *Jaynes*, 216 S.W.3d at 851. The record must contain evidence of counsel's reasoning, or lack thereof, to rebut the presumption. *Moreno v. State*, 1 S.W.3d 846, 865 (Tex. App.—Corpus Christi 1999, pet. ref'd). We review the totality of representation rather than isolated instances in determining whether trial counsel was ineffective. *See Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006); *Lopez*, 343 S.W.3d at 143.

**B.    Discussion**

Appellant raised ineffective-assistance of counsel claims in his motion for new trial. Neither appellant's contentions in his motion for new trial, nor his trial counsel's testimony at the hearing thereon, comport with his issues on appeal. Rather, trial counsel took the position that he neither possessed nor knew of the germane statement because the State suppressed it. Consequently, the record does not reveal the basis of trial counsel's decisions complained of on appeal.

We will not "reverse on ineffective assistance of counsel grounds when counsel's actions or omissions may have been based on tactical decisions, but the trial record contains no specific explanation for counsel's decisions." *Bone v. State*, 77 S.W.3d 828, 830 (Tex. Crim. App. 2002); *Brown v. State*, 155 S.W.3d 625, 631 (Tex. App.—Fort Worth

30

2004, pet. ref'd); *see Landers v. State*, 110 S.W.3d 617, 623 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (holding appellate court must presume sound trial strategy on a silent record, especially when the defendant's trial counsel was not put on notice to answer complaint at new-trial hearing); *Lagaite v. State*, 955 S.W.2d 860, 864 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd) (refusing to speculate on counsel's trial strategy where defendant's new-trial motion did not raise ineffective-assistance claims presented on appeal).

Assuming appellant's trial counsel knew of the statement, which the trial court found and we upheld, we would need to speculate regarding why trial counsel decided against using it to impeach Mendez. Implicit in the premise of the trial court's finding—that trial counsel's reference to the statement in a question and in a bill of exceptions manifested an awareness of the statement—is the fact that trial counsel did not altogether disapprove of using the statement. Decisions of when and how to use evidence is a fundamental matter of trial strategy, as are decisions of what questions to ask on cross-examination. *Hollis v. State*, 219 S.W.3d 446, 470 (Tex. App.—Austin 2007, no pet.) (citing *Miniel v. State*, 831 S.W.2d 310, 324 (Tex. Crim. App. 1991) (en banc)); *see Tutt v. State*, 940 S.W.2d 114, 121 (Tex. App.—Tyler 1996, pet. ref'd). We hold appellant failed to rebut the presumption that his trial counsel's performance fell within the wide range of reasonable professional assistance by not impeaching Mendez with the post-polygraph narration from the polygraph examiner. *See Lopez*, 343 S.W.3d at 142–43; *Moreno*, 1 S.W.3d at 865.

31

Regarding appellant's contention that trial counsel was constitutionally deficient for not having the polygraph examiner testify on the post-polygraph-examination summary, we hold that the presumption that counsel used sound trial strategy has not been rebutted. "[T]he decision whether to present witnesses is largely a matter of trial strategy." *Shanklin v. State*, 190 S.W.3d 154, 164 (Tex. App.—Houston [1st Dist.] 2005, pet. dism'd) (citing *Rodd v.State*, 886 S.W.2d 381, 384 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd)); *Smith v. State*, 84 S.W.3d 36, 42 (Tex. App.—Texarkana 2002, no pet.). In addition, any testimony relating to the contents of that statement would have been inadmissible hearsay. *See* TEX. R. EVID. 801(d), 802, 803(3)(B). Appellant has not shown that counsel's representation fell below an objective standard of reasonableness.

Looking at the totality of trial counsel's performance, we note that he filed pretrial motions, conducted vigorous cross-examination, presented testimony from several defense witnesses that challenged the State's case, and made timely and appropriate objections. Even if we assumed that appellant's trial counsel's performance fell below the objective standard of reasonableness in either manner contended, appellant has not shown that there is a reasonable probability that but for counsel's deficient performance the result of the proceeding would have been different. *See Lopez*, 343 S.W.3d at 142; *Moreno*, 1 S.W.3d at 864. The evidence connecting appellant to the crime was substantial. The impeachment evidence of what Mendez may have heard but could not verify on the eve of Meland's murder and Mendez's subsequent speculations do not undermine the evidence connecting appellant to the crime scene at a time inconsistent with the defense's alibi and consistent with the range of time of Meland's murder. Thus,

appellant fails the second *Strickland* prong and the requisite showing that an isolated error was so egregious as to render counsel constitutionally deficient. *See Lopez*, 343 S.W.3d at 143. We overrule appellant's tenth and eleventh issues.

## VI. CONCLUSION

We affirm the trial court's judgment.

GREGORY T. PERKES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
14th day of November, 2013.